The next matter on our calendar is Altamayo Asset Management and ODS v. JA Solar Holdings. Before we proceed with argument, Judge Engelmeyer wants to respond to the motion for recusal made by Altamayo, I believe. Thank you, Judge Pooler. The plaintiff appellants have requested my recusal based on my having resolved in the district court an unrelated lawsuit involving a different issuer, which also involved a claim under Section 10b of actionable statements regarding relisting. I decline the request to recuse. There is no basis for recusal under either 28 U.S.C. Section 47 or Section 455. I do not have any prior involvement in this case. I do not have any interest in this case. I resolved a different case based on different facts involving a different issuer. That circumstance does not give rise to a reasonable basis to question a judge's impartiality. Thank you, Judge Engelmeyer. We'll hear from Altamayo. Sure. Thank you, Your Honor. What is before us is your motion to remand. Well, I denied your request to adjourn, hence you're all here. But what is before us is the motion to remand. Were we to grant that motion, we wouldn't necessarily get to the merits today. Sure. Why don't you argue why remand is necessary? Well, sure. We think, you know, Judge Carter himself has made the case for remand, and we think it amply meets the standards of FRAP Rule 12.1. Judge Carter has held that the new evidence presented was something that could have a substantial impact on the rulings, both on materiality and loss causation, and that this Court should have the benefit of his ruling on these issues prior to making a ruling on the motion to dismiss. And he held it highly relevant to the Second Circuit's consideration of falsely and loss causation. So, really, based upon the Court's ruling, the question was whether or not we had a concrete plan, whether we had alleged this. We now do allege. We show that there were significant negotiations in the end of 2017. And then we show that there was a letter of intent in February 7th of 2018. A letter of intent is, we believe by definition, such a concrete plan. May I ask you this? Sure. I understand the theory is that essentially with the additional facts, you would have a separate bucket of actionable statements. You have the fairness opinion, which Judge Carter has already sided with you on as to its being actionable, or at least materially false, and you would now contend that with the additional facts, the relisting, or the no relisting plan representation is also. How does that affect the either loss causation or reliance elements that, with respect to the respective subsets of plaintiffs, present other required elements? Sure, it can. We would, upon remand, we would allege, and it's subject obviously to further investigation, but we would allege the more concrete a plan is, the more that impacts valuation. And it's shown actually by the allegations in this complaint. We see that during the class period, as the merger became more and more imminent, as the date became more and more closer to the actual deadline. But what Judge Engelmeyer is saying is the judge already found in your favor on the fraud claim on the valuation of the shares. So this doesn't change the terrain all that much. Of course it changes the terrain. Tell me why. Because, first of all, there's two separate paths of claims here, and one was foreclosed to us. And so they're not one and the same. They're obviously separated by Judge Carter, given that he felt they were different in nature. And that can impact damages, that can impact recoverability. If we have left false statements, there's going to be arguments like class certification regarding price impact. There's going to be arguments regarding damages. And it could be, and we will allege, that there was more damages to investors by them not knowing about this relisting plan. There's two issues. It's one thing to say, well, your financial projections were depressed, which is what Judge Carter found we had properly alleged. It's another thing to say you knew about a concrete relisting plan and didn't disclose it to investors. Those are two different misrepresentations in nature, and the damages for those misrepresentations very well could be different. Isn't the best argument for you a little different, which is that the more concrete the relisting plan, the more reasonable it is to cite the relisting price as proof of loss causation? In other words, it moves earlier in time, in effect, the relisting. The challenge for you is obviously proving loss causation given the absence of a corrective disclosure. But if the relisting is almost immediate afterwards, it becomes a little more reasonable for you to cite the facts surrounding the relisting as evidence of loss causation. I agree with what Gerard said. I would, in a sense, rephrase it. The more likely it is that there's going to be a relisting, the higher the valuation of the stock at a given time. If I know you may relist in a year, the value of that share is different if I know you certainly will relist in a year. And so there's just simply a valuation on that, and it's just shown, it's borne out during the class period. As the merger and the tender became more realistic, the price of the shares went up because they knew it's becoming more and more of a certainty. As each regulatory hurdle, as the vote progressed, it became more and more of a certainty, and therefore the share price almost equaled the tender price right at the very last day of the class period. It's a certainty of something versus the possibility or probability of an event. So that's why it certainly would impact not just materiality, but loss causation. Really, how material the statement is can impact the damages to investors. What about the reliance issue? On reliance, Your Honor, a number of matters. First of all, we do need— We're only talking now about the tenderer shareholders? Reliance to the tenderer shareholders. So it's a number of matters. We think that the Mills court— I'm sorry, the Mills court in the— I don't think the district court reached Mills or— District courts do not discuss Mills, no. Right. And so it's Supreme Court precedent, and so that clearly is a reason to—that would be a reason to reverse it, that there's no discussion of Mills. So that's a factual question of how many votes were tendered, how many—what percentage of the votes tendered voted in favor of the merger? Well, I don't think there's any dispute that there were—they needed minority votes in order to have the vote succeed and the merger succeed. So if they needed minority votes, then the tenderers get the reliance, get Mills' reliance. That's what you're arguing. That's exactly what you're arguing. And the district court never reached that issue. The court never reached that issue. That's certainly grounds for reversal. But that has nothing to do with what the Chinese regulatory agency found. That's a separate issue where you were appealing from the district court's decision. Well, I think, Your Honor, the question would be also—because we do allege it in the complaint. We allege an alternative reliance. We allege reliance individually, and we allege reliance based on the market. We would then also, on remand, bolster allegations regarding individual reliance. But what is the new finding by the—what is it called, the CSRC? Yes. Some combination of letters? Yes, yes. What does that have to do with Mills' reliance? Well, no, it doesn't have to do with Mills' reliance, no. Right, so that your motion to remand is just a basic—this is the basic appeal before us, which if we remand, we wouldn't reach. Well, you would reach for the—you give the court a full record to deal with materiality, lost causation, and then we could address reliance as well. Maybe the court could actually have an opportunity to address Mills. The court shouldn't, I don't think, issue an advisory opinion. Right, we don't do that. This court doesn't do that, and I think it would be a nature advisory because even if the court would somehow affirm based on reliance, we would still seek to—seek leave to amend at the corporate law based upon a new fact, and we would actually bolster the allegations particularly with respect to individual reliance and how the new allegations impact material reliance. And tell me succinctly how this relisting finding by the CSRC, if I got that initials right, how that affects the lost causation on behalf of the seller shareholders. Because we will allege and amend the complaint how, and we could do it also with principles evaluation and hire experts as well, is that if there is an actual definite plan, how that will impact a share price and impact a tender price versus where there's some potential or discussed plan potentially a vague plan. So it's all of the piece. It's all of the piece, exactly. That is our contention, Your Honor. We would like the opportunity to fully amend the complaint to address all these issues. Judge Carter is on the record saying this is something that he—that this court should allow and then have a full record, and we hope—we're hopeful that if we have that full record, we would succeed under the concrete and definite standard and therefore have a successful plaintiff. Thank you. Thank you, Your Honor. We reserve some time for rebuttal. We'll hear from J.A. Soller. Good morning, Your Honors, and may it please the Court. Brad Klontz for defendant's affiliates, J.A. Soller. I think the panel has honed in on the critical issue, which is that the new evidence changes nothing with respect to the elements of loss causation or reliance. They're not alleging a new false statement. They're not changing the timeline at all. They're not—they can't change the fact that the share price— Counsel, I have in front of me your opposition to the motion to remand or adjourn, and I'm looking at page 9, item C, and you say with a straight face, the CSRC decision cannot remedy plaintiff's failure to plead an actual concrete plan to relief. Really? Is that what you're really saying? Yes, Your Honor. Really? Well, if you read the text of the CSRC decision— Which I did. Which you did. It wasn't exactly flowing English, but I read it, yes. Yes. No, what it basically says is that the parties were in the process of engaging in discussions, evaluations of this, and if you look at the timeline of the overall case, it actually supports that. The letter of intent that plaintiffs rely upon that is signed in July of 2018, that still doesn't contain pricing, structure, et cetera. But they deny even being in talks. They're in talks, but that's different than a concrete and definite— Why wouldn't we send this back to Judge Carter to look holistically at the new evidence and make the determination, as he is asking us to do, about whether this dimension of the case is actionable? Because no purpose would be served, Your Honor. Respectfully, no purpose would be served by sending back a case that has fatal deficiencies in pleading loss causation and reliance. But he told us he wants to look again at those issues in his order of October 15th. Yes. He said he wants to look again specifically at loss causation. Yes, but we— Wouldn't we respect the judge's request? Of course we respect the judge's request, but the remand request is discretionary. The case is properly before this court, and there are at least two substantive issues that will be completely unaffected by the resolution of whether the CSRC decision affects the claim of a false statement or not. The plaintiff's theory of loss causation is no less speculative with this new document than it was before. And if the district court—even if the district court is— Who are you going to believe, me or your own eyes? Is that what you're saying? No, Your Honor. I'm saying with respect to loss causation. So even if you believe that the CSRC decision evidences a concrete plan to relist, that still doesn't move the needle at all with respect to loss causation. Why is that? Because plaintiff's theory is essentially that having—because the ADS price didn't move at all in response to— or increase in response to all the disclosures at issue in this case, and since the tendering shareholders got a significant premium over the prevailing market price, any allegation that under different disclosures plaintiffs somehow would have received an even greater premium or the ADS price would have increased even more is completely speculative. Well, look, I— The gravy west goes on all fours on that. Look, I understand that this is different from the usual corrective disclosure paradigm where at least you have the starting point of a stock drop as at least the starting point to measure loss causation. Right. On the other hand, the nature of the problem here means that you're never going to get that because there's a buyout by virtue of the tender offer. And so on that theory, if that's what you're looking for, there's no way a plaintiff in this situation, even if lied to like crazy in terms of the fairness opinion, if they sell on the market beforehand, is going to be able to have a claim. That seems like an overreach. And if you take the view that the relisting statements are more likely to be actionable and that a statement, we've got a concrete plan to relist or we're likely to relist or we've taken the following steps towards relisting, would have generally tended to make the stock more attractive, why isn't that something that experts can battle upon in discovery and summary judgment? How can that be resolved on the pleadings? Yeah. Sure, Your Honor. Gravy West Co. is explicit, and the other cases, Barrows, et cetera. Plaintiffs have to allege a non-speculative theory that the disclosures in this case caused them a loss, not that their shares were undervalued in some general sense. There are appraisal actions for that. There's an appraisal action going on in the Cayman Islands as we speak with respect to this merger. So it's not that they're without recourse if they can't pursue this theory under the disclosure-based securities laws.  What you could imagine a scenario where there was a stock price drop at some point in response to some disclosure along the way, or you could imagine a scenario which goes to the reasoning in Gravy West Co. where there was some pleading of an alternative transaction that was foregone, some more lucrative opportunity that was available that people had to forego because they were lied to. Wait, sorry. If the plaintiff is essentially saying, I sold during the tender process, but I chose to sell on the market, and I agreed to sell at a price that more or less was influenced by the tender offer price because I believed in the negative mass statements that the company was making about its prospects and because I accepted that there was no relisting plan, had I known those things, A, the tender offer price, which may have guided the market, would likely have been higher, but beyond that I would have held because I would have thought this is valuable. What's wrong with that theory? And why shouldn't the plaintiff be allowed in discovery to test that, in fact, there was a viable loss? Okay. Well, so I guess the threshold point is that plaintiffs here have not alleged any facts like that. What you're describing is basically a reliance rationale, that if we took this into account, if we had known this, we would have done this or that. We relied on the disclosures in making our purchases. There are no facts pled here whatsoever that go to actual reliance. The plaintiff is pleading that we had an eye on the market. The plaintiff is pleading that we had an eye on what the disclosure was pertinent to the tender offer, fairness of opinion and the like, in deciding to sell. Are you saying that transaction causation isn't pled? Transaction causation is not pled as to the tendering shareholders. We concede that plaintiffs can plead transaction causation with respect to the selling shareholders. And that's who I'm referring to. Yes. They can invoke the basic presumption. But I think under the precedents in Gravy, Wesco, Barrows, et cetera, the allegation that the disclosures they're challenging actually caused them a loss has to be non-speculative. It has to be something on something other than just this generalized notion that under some alternate set of negotiations or disclosures, we might have gotten more for their shares. Why doesn't the ruling of the CSRC that there was insider trading change all the facts available? Why doesn't that by itself give the plaintiffs an opportunity to claim that they relied on misinformation? There was insider trading going on. That's what they say. That's the phrase they use. That's the phrase they use. But it's insider trading by third parties who have nothing to do with this case, who are not members of James Miller, not members of management, third parties. Gin was the man. Wasn't Gin involved in this? No. The insider trading did not involve defendants. He was talking to the other company that was involved with this. They were the ones that were insider trading. Defendant Gin was involved in discussions or evaluations of a potential realist. Which he disclaimed in the proxy materials. That's right. So he was lying in the proxy materials. Well, we don't agree with that, Your Honor. Under this court's precedent in Azerite, facts have to be pledged that there is a definite, concrete plan to realist. In this sort of a scenario, disclosure of a half-baked tentative plan that doesn't end up happening could be just as misleading as a failure to disclose a definite plan that does happen. What would evidence of a concrete plan? Give me an example of what to you that would look like. What would have to be withheld? Yes, Your Honor. Taking the discussion in Azerite as an example, the setting of a price, the determination of a structure for the new organization, a decision as to which exchange the new entity would be listed on, the hiring of advisors, lawyers, investment bankers, and the like. There are many indicia. And there's a long process. Remember here, the LOI, which in July 2018, which really is just an agreement to continue to negotiate, sets none of those terms of a new potential realistic. And then the price for the realistic isn't set until six months later, the following January, and the realistic doesn't close until the following July. What do we make, though, of the timing, the fact that this realistic, the intent of it happened so quickly after the merger? I mean, that's one of the things that... So a couple points there, Your Honor. It didn't happen quickly after the disclosures that issue, which were in the proxy statement. That was in February. The letter of intent, which we contend essentially can, you know, the terms of it basically just events an intent to continue to negotiate and evaluate. None of the key terms are indicia of a concrete plan are there. That's six months after the proxy in July. Then the price for the realistic isn't set until six months after that, and then the realistic doesn't close until the following December, almost a year after the pricing, almost two years after the proxy. So we believe that the timeline here actually supports our position. But what the Chinese regulatory agency found is that the talks were beginning during when the proxy materials came out, which, as I said before, were fraudulent. They said that we have no plans for relisting, when they obviously did. Your Honor, so we would make the distinction, yes, talks were starting, but those talks were preliminary, evaluative. But they denied any talks or any intent during the proxy materials, didn't they? No, respectfully, Your Honor, no. They denied any current plans or proposals to relist, and in the proxy in the same breath explicitly warned and confirmed that the company may relist, including on an international stage. Counsel, how much did the defendant, Jin, clear after the merger? How much did he wind up with? Was it $2 billion? No, I don't believe it was that high, Your Honor. I don't have a specific figure for you. Okay, I'll ask. But I think it was alleged to be a substantial amount. Can I ask a final, from my perspective, case management question? If I were a district court judge, which on every other day I am, and a development like this hit, whatever else I would do as to the existing complaint, I would certainly leave to amend on the theory that the information that came out from, that's just been disclosed by the Chinese authority, may be the tip of the iceberg, and plaintiffs' counsel are entitled to do some investigation around it, which may further flesh out the facts. If, looking down the road here, we see an amendment realistically as being going to be available from a seasoned case management judge, why not get ahead of it now and remand? Well, I think actually I would contend, Your Honor, that the considerations actually cut the other way. If there are fatal flaws in this theory, if we have absolute non-starters in terms of lost causation and reliance, better for the district court to know that now and get ahead of it in that sense. I think the district court, if it's going to consider this case further, would benefit greatly from the panel's guidance. Thank you, counsel. Thank you, Your Honor. Mr. Lieberman? Yes. How much did Mr. Jin clear when they're almost dead and done? A mere $440 million, Your Honor. Not the $2 billion that was suggested, but I think $440 million is quite a lot of money. So when we talk about speculative and we say that the theory is speculative, we show a valuation, we allege a valuation of $1.1 billion that was reported after in the run-up to the relic. And so there's not a speculative claim here. When we're talking about lost causation, the first principle is we look at Durrell. And Durrell makes clear there's a myriad of ways to allege a loss. It's not just, well, there's only one myopic way, a stock drop. That's when you're a purchaser, maybe a stock drop. There could be, there's clearly in this situation where you've been duped into selling and you could have sold at a higher value, or there's a scenario you could get dividends or lost profits that you may not have received. Counsel, would you contemplate requesting of Judge Carter the opportunity to amend the complaint based on his newly received information, or are you happy with the complaint as it stands? We very much want to amend the complaint, Your Honor. There's obviously these new allegations and how they relate to lost causation, reliance, and materiality are quite consequential, and so absolutely we want the opportunity to amend. And we think that will impact all the relevant theories and elements that can be claimed in this case. Although you're prepared to go with the complaint as it stands now, but you would like the opportunity to amend. If not given the opportunity to amend, we will defend the complaint. We do think it's a safe to claim, and we're prepared to defend it, but we think the amendment will materially alter the landscape, and Judge Carter agrees. He says it will alter. He says it is highly relevant to the determination, and so he does say it may materially alter the outcome. Just to plant a discussion on the lines, we discussed Mills and how it wasn't addressed. I just want to address the concept of reliance that we discussed in our briefing, which is that even if we didn't plead an individual reliance, and even if we didn't have the benefit of Mills, you also have just the concepts of Basic and Halliburton and Goldman, you do have where reliance is a matter of degree, where even if it were true, there was no evidentiary finding of an inefficient market. So Judge Carter didn't go into analysis of whether or not this market was efficient. Usually in the Goldman decision, it was contemplated that when those determinations would be made with the benefit of an evidentiary hearing. But particularly based on the allegations of our complaint, the for-on-the-market principle is a proxy for price impact, i.e. the court was saying in Basic, we don't want to force you to prove price impact. That might be too hard at this stage. We'll let you do the efficient market hypothesis. If you can show an efficient market, you don't have to go through that strenuous... But what is comparable for the tenderer? Right, so here the tenderer itself was clearly a product of fraud. The price is fraudulent. So when we're talking about price impact, it's directly alleged in our case. The $7.55 per share, which was said by Julian to be a fair price, was a fraudulent price. Are you arguing that even the tenderer shareholders get the benefit of the Basic presumption? Yes, under the price impact theory, absolutely. And you didn't plead that, of course. We did plead that. We did say that materiality is a question of, or efficiency is a question of degree, and particularly the question that's being asked in Basic are, is it likely, because it's an efficient market, that the fraud impacted the price? That's the question. But here we've got that direct allegation. Clearly the fraud impacted the price. The price is fraudulent. We don't even need the Basic presumption. We think we can improve this in an efficient market, but we don't even need it, because Basic is asking that fundamental question, can we come up with a proxy for price impact? Why do I need a proxy when I have price impact in the complaint itself? I just want to throw out that concept. Thank you very much. Thank you both. We will reach our decisions on whether to remand or not shortly. Thank you.